IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TRECE DEPEW and SUESONIE CHENEY,<br><br>       Plaintiffs,<br><br>v.<br><br>SHOPKO STORES, INC.,<br><br>       Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. CV-03-0539-S-BLW

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**INTRODUCTION**

Plaintiffs brought this action against ShopKo for overtime pay under the Fair Labor Standards Act (FLSA). The Court held a bench trial and took the matter under advisement. For the reasons expressed below, the Court finds that Plaintiffs are not entitled to overtime pay under the FLSA.

**FINDINGS OF FACT**

<u>**Summary of Claims**</u>

1.     Plaintiffs Trece DePew and Suesonie Cheney are employed by ShopKo at its Twin Falls store, also known as Store 67.

2.     DePew started working for ShopKo in 1979, and has been with the Twin

Falls store since 1986.

3.     Cheney started working for ShopKo in 1986, and has been with the Twin

Falls store since that date.

4.     DePew and Cheney claim that ShopKo violated the FLSA by failing to pay

them overtime wages for the period beginning December 15, 2000, and

continuing through the present.

5.     Their basic claim is that since December of 2000, ShopKo has required them

to do much more hourly work, and withdrawn both the time and discretion

previously available to them to manage their departments.

6.     If Plaintiffs ever were managers – exempt from the FLSA's overtime

provisions governing hourly workers – they allege they no longer are, as

these changes have destroyed the exemption and qualified them for overtime

pay.

## Organizational Structure

7.     ShopKo is a regional retail company with its headquarters in Green Bay,

Wisconsin.

8.     ShopKo divides it territory into Regions, and the stores in Idaho are within

Region 5.

9.     Each region has a Regional Director.

**Findings of Fact and Conclusions of Law – Page 2**

10.    The management of each store is led by a Store Manager who reports to the Regional Director for that Region.

11.    The Twin Falls ShopKo store had 6 Assistant Managers who reported to the Store Manager.

12.    DePew and Cheney were Assistant Managers over different departments.

13.    DePew was the Apparel Manager.

14.    Cheney was the Customer Service Manager.

15.    Lisa Cameron was Store Manager for Store 67 from 1986 to the end of June, 2003.

16.    Jeff Harman was Store Manager for Store 67 from November of 2003, until the end of October of 2005.

17.    ShopKo classified both of these positions as exempt under the FLSA, meaning that it considered both positions as management positions, and consequently paid DePew and Cheney a salary without overtime.  *See Exhibits* 1006 & 1007.

18.    As Apparel Manager, DePew supervises the work of between 8 and 20 hourly teammates in the Apparel, Active Shoes, and Jewelry departments of the Twin Falls Store.

19.    Her job description states that she is to "[a]ct as [the] primary supervisor of

**Findings of Fact and Conclusions of Law – Page 3**

day-to-day operations of all apparel, shoes and jewelry departments and all

assigned teammates [and to] ensure[] [that] operational objectives are

maintained at all times." *See Exhibit 1006.*

20.  Among other duties, she must '[e]nsure that teammates are fully trained to

perform their jobs with a high level of skill and motivation." *Id.*

21.  As Customer Service Manager, Cheney supervises a total of between 20 and

40 hourly teammates in her department, and at any given time has 6 or 7

persons working under her supervision on the floor.

22.  Cheney's department consists primarily of the "Front End," comprised of

team members who work the cash registers and the Customer Service Desk.

23.  Cheney also supervises the Price Auditor who audits the store's compliance

with state and federal price accuracy laws.

24.  Her job description states that she "[a]cts as [the] primary supervisor of day-

to-day operations of checkstands, customer service desk, cash office, price

integrity and store maintenance; [and] ensures operational objectives are

maintained at all times." *See Exhibit 1007.*

25.  Among other things, she must "[e]nsure[] that teammates are fully trained to

perform their jobs with a high level of skill and motivation."

26.  During this time period, the Twin Falls ShopKo store had about 100

employees.

**Duties Prior to 2000**

27.    Before December of 2000, Plaintiffs as Assistant Managers had the authority

– on their own initiative without approval from higher management – to,

a.    Order inventory;

b.    Write and run newspaper advertisements;

c.    Buy equipment and supplies;

d.    Buy, place, and price products that they thought would sell well;

e.    Schedule shifts for their team members; and

f.    Discipline and/or fire team members.

**Duties Since 2000**

28.    Since 2000, ShopKo has instituted guidelines designed to instill

standardization and uniformity in the management of their stores.

29.    Under these guidelines, Plaintiffs no longer have the authority to act on their

own in the six areas listed above – they must make recommendations that

have to be approved by upper management before taking action in these six

areas.

30.    Within these guidelines, however, Plaintiffs exercise substantial discretion.

31.    For example, when positions on their team needed to be filled, Plaintiffs

**Findings of Fact and Conclusions of Law – Page 5**

would decide who to interview based on resumes then on file.

32.   Based on those interviews, Plaintiffs would make hiring recommendations to the Store Manager.  *See Transcript* at p. 149.

33.   Plaintiffs' hiring recommendations were generally accepted by Store Managers because they trusted Plaintiffs' judgment.  *Id*.

34.   Plaintiffs' recommendations to retain probationary employees or to promote regular employees were also generally accepted.  *Id*. at 448-49.

35.   Importantly, Plaintiffs' conducted the evaluations of their own team members used for pay raise purposes.  *Id*. at p. 152.

36.   Store Manager Cameron testified that she relied on the judgment of Cheney and DePew, and could not recall ever modifying an evaluation prepared by them.  *Id*.

37.   With regard to disciplining employees, Cheney testified that Store Manager Hartman usually agreed with her recommendations.  *Id*. at p. 1019.

## Allotment of Payroll Hours

38.   In 1997, ShopKo implemented a program known as Visual Labor Management (VLM).

39.   VLM was designed to set the number of payroll hours for each ShopKo store depending primarily on forecasted sales.

**Findings of Fact and Conclusions of Law – Page 6**

40. Prior to November of 2004, the VLM would give each store an allotted number of hours but would not break down those hours by department.

41. In November of 2004, ShopKo implemented an upgrade to VLM known as the Wall-To-Wall program.

42. The Wall-To-Wall program contains much more detail and allots hours not only to the store as a whole, but to each department within the store.

43. In allotting those hours, the Wall-To-Wall computer program takes into account over 500 factors that are based on the particular size and makeup of the store, along with past and projected sales.

44. The allotted hours are for hourly workers only, not management.

45. The program is run about two weeks ahead of the week at issue, and thus ShopKo expects Store Managers to make changes when events in the interim change hours needed.

46. Each store generates its own schedule.

47. The Store Manager enters the Wall-To-Wall program, makes any edits to cover specific circumstances at this store over the next two weeks, and then prints out the schedule which would be applicable for the week that is two weeks in advance.

48. The Store Manager distributes the schedule to Assistant Managers like

**Findings of Fact and Conclusions of Law – Page 7**

Plaintiffs.

49.   Plaintiffs have the discretion to request additional hours from the Store

      Manager.

50.   Store Managers have the discretion to request additional hours from

      Regional Directors.

51.   The reality, however, is that there is top-down pressure for each Store

      Manager to stay within the allotted hours.

52.   Store Managers Cameron and Hartman testified about their frustration in

      obtaining more hours.

53.   Between 2000 and 2005, while sales at Store 67 were steadily declining,[1] the

      annual number of allotted hours for the Store dropped each year.

54.   In an e-mail dated December 1, 2003, ShopKo's Regional Director Jacques

      Herring admonished Store Managers that "you are to spend what you are

      given."  *See Exhibit 1039.*

55.   Herring explained what he meant in that e-mail as follows:  "That means that

      you are given a certain amount of payroll [hours] based on a number of sales

      . . . .  If those sales go down, you have to adjust down.  But there is no way

------

[1] Sales at Store 67 declined about $1 million between 2001 and 2002.  *See Exhibit C to Gustafson Deposition.*  They declined again in 2003, rebounded in 2004, and went back down in 2005.  Over the four year period from 2001 to 2005, sales at Store 67 dropped $1.6 million.  *Id.*

**Findings of Fact and Conclusions of Law – Page 8**

you should go up if you don't make no sales to support those numbers." *See*

*Herring Deposition* at p. 148.

56.   The result of the reduced allotment of hours for Store 67 was that Plaintiffs

and the other Assistant Managers had to do more hourly work.

**Plaintiffs' Performance & Pay Raises**

57.   Each year, ShopKo undertakes a formal evaluation process to review

Plaintiffs' performance as managers.

58.   As part of that process, the Plaintiffs submit self-evaluations, judging their

own performance as managers over the past year.

59.   For example, in rating her own management performance in May of 2004 (to

Store Manager Hartman), DePew stated that

a.      "I strive hard as a manager in our store to make things happen."

b.      "I am able to take charge in most any situation."

c.      "I am able to supervise and direct any number of teammates to

accomplish goals." *See Transcript* at p. 789.

60.   Cheney had similar self-evaluations, stating in one she wrote in June of 2004

that,

a.      "I give directions to my people, but also allow them to make decisions

so they can learn and develop.  I help in other areas and departments

**Findings of Fact and Conclusions of Law – Page 9**

as needed.  I feel I have a total store awareness and stay involved in all areas."

b.   "I schedule my people efficiently around ads and events and give them the needed tools and resources to accomplish their job."  *Id*. at p. 1077.

61.   Over the years, Plaintiffs' supervisors largely agreed with these positive assessments of Plaintiffs' management skills.

62.   With regard to DePew, Store Manager Hartman wrote in his evaluation the following:  "Whole team looks to Trece to be a leader.  Inspires people to better themselves.  Is able to affect the whole store with her leader attitude."  *See Exhibit 2013; Transcript* at p. 426.

63.   With regard to Cheney, Store Manager Hartman testified that she "scheduled and led the front end team, which is an integral part of any store.  The customers, first thing they see as they walk in the door and the last thing they see as they leave is their front end. And that team, if not running well, can cause me a lot of extra work as a store manager."  *See Transcript* at p. 458.

64.   These evaluations, on which pay raises were based, gave numerical scores to Plaintiffs based on their performance in four core categories:

**Findings of Fact and Conclusions of Law – Page 10**

      a.     Leadership Competency;
      b.     Teammate Retention;
      c.     Average Sale; and
      d.     "C.T.C.P. (Main Store)."

65. Each of these four categories was weighted according to its relative importance.

66. The category of "Leadership Competency" was weighted the highest, comprising 40% of the total.

67. At no point in the evaluation process were Plaintiffs graded on their ability to do hourly work such as operating cash registers, collecting carts, or cleaning restrooms.

68. When Store Manager Cameron was asked whether, considering all of DePew's various duties, the "leadership component" of those duties was "the most important to you," Store Manager Cameron answered "[y]es." *See Transcript* at p. 205.

69. Since 2000, Plaintiffs' numerical scores for "Leadership Competency" indicated that they were meeting, and in some cases exceeding, expectations.

70. Since 2000, Plaintiffs received regular pay raises based on these evaluations.

71. DePew's salary in 2001 was $48,048, and is now at $50,987.59. *See Transcript* at p. 542.

72. Cheney's salary in 2001 was $35,832.68, and is now at $39,122.25. *Id.* at p.

**Findings of Fact and Conclusions of Law – Page 11**

543.

## Conflicting Testimony on Performance of Management Duties

73.   At trial, DePew and Cheney both testified that since 2000, they are not able
to adequately perform their management duties.

74.   The reason, they testified, was because they were too busy with hourly
duties, such as operating cash registers, collecting carts, and cleaning
restrooms.

75.   They testified that this hourly work was the primary duty ShopKo expected
them to perform.

76.   DePew estimates that in the last 5 years, she spends only 25% of her work
time on management duties, such as planning and training, while the other
75% is spent on hourly duties such as operating a cash register, collecting
shopping carts, or cleaning restrooms.

77.   Cheney testified that from 2000 until the summer of 2004, "70 to 80 percent
of my time would be spent doing hourly tasks . . . ."  *Id*. at 1073.

78.   Since the summer of 2004, Cheney estimates she spends only 10% of her
work time on management duties and 90% of her time on hourly duties,
primarily operating cash registers.  *See Transcript* at p. 1071.

79.   When DePew was asked whether she could train team members while

**Findings of Fact and Conclusions of Law – Page 12**

working side-by-side with them doing hourly work, she responded,      "[n]o

. . . [b]ecause I'm busy doing my own job." *See Transcript* at p. 894.

80.    When Cheney was asked whether she could train team members while

working side-by-side with them doing hourly work, she responded, "No . . .

I have no idea what they're doing. I'm involved with the customer that I'm

dealing with, and you really don't pay attention to what's going on around

you with the other cashiers." *See Transcript* at p. 927.

81.    Plaintiffs' trial testimony contradicts their self-evaluations.

82.    At trial, Cheney and DePew have testified that they are unable to fulfill the

management duties required of them in their written job description,

discussed above and contained in Exhibits 1006 and 1007.

83.    Yet their self-evaluations state that they are performing those duties, and the

Store Managers largely agree in their own evaluations.

84.    This conflict goes to the heart of this case.

85.    Accordingly, resolution of this case will largely turn on how this conflict in

the evidence is resolved.

## Resolution of the Conflicting Evidence

86.    Since 2000, ShopKo has implemented strict policies to survive in the

intensely competitive retail business.

**Findings of Fact and Conclusions of Law – Page 13**

87.   As a result, Plaintiffs' Assistant Manager jobs have changed over the last 5 years – Plaintiffs now do more hourly work and exercise less discretion.

88.   The Plaintiffs are understandably dissatisfied with jobs that have become much less desirable.

89.   Despite the stress caused by this leaner and flatter management structure, Plaintiffs continue to perform their core management tasks of selecting, training, and leading their team members.

90.   Plaintiffs' duty to select, train, motivate, and lead their team members is their primary duty, more important to ShopKo than any other duty.

91.   Cheney revealed the primacy of this duty in her response to a question asking her to reconcile the conflict between her trial testimony (that she was not managing) with her self-evaluations (that she was managing):  "I didn't lie to the company [in my self-evaluations].  I told them what they wanted to hear."  *See Transcript* at p. 1061.

92.   If ShopKo "wanted to hear" that Cheney was training and leading her team members, ShopKo must have considered those duties to be crucial.

93.   This conclusion is supported by the following evidence, summarized below and discussed more fully above:

   a.   Plaintiffs' own self-evaluations stating that they were performing their management duties;

b.  Evaluations of Store Managers revealing the crucial importance of management duties, and concluding that Plaintiffs were performing well in those duties;

c.  The evaluation forms themselves, that stressed "Leadership Competency" above all other qualities, and ignored Plaintiffs' performance of hourly tasks;

d.  Regular pay raises received by Plaintiffs in large part for performing managerial duties, not hourly work; and

e.  Testimony that the recommendations of Plaintiffs on hiring, retention, promotion, pay-raise evaluations, and discipline were routinely approved by Store Managers who relied on Plaintiffs' judgment.

94. Given this evidence, the Court cannot find credible Cheney's testimony that she only spends 10% of her work day doing management tasks since the summer of 2004.

95. Store Manager Hartman testified that Cheney was spending about 50% of her time on hourly tasks before Wall-To-Wall, a percentage that rose to at least 60% after Wall-To-Wall was implemented in November of 2004. *See Transcript* at p. 288.

96. Hartman's testimony is much more consistent with the evidence listed above than Cheney's trial testimony.

97. The same analysis applies to DePew – before Wall-To-Wall was implemented, about 50% of her work day was spent doing hourly work.

**Findings of Fact and Conclusions of Law – Page 15**

98.     After Wall-To-Wall was implemented in November of 2004, about 60% of

        her work day was spent doing hourly work.

## CONCLUSIONS OF LAW

1.      The FLSA requires employers to pay their employees time and one-half for

        work exceeding forty hours per week.  *See* 29 U.S.C. § 207(a)(1).

2.      The Act exempts persons "employed in a bona fide executive,

        administrative, or professional capacity."  *See* 29 U.S.C. §  213 (a)(1).

3.      ShopKo has the burden of showing that the exemption applies.  *Donovan v.*

        *Nekton, Inc.,* 703 F.3d 1148, 1151 (9th Cir. 1983).

4.      The exemption is narrowly construed against ShopKo.  *Kiem v. County of*

        *Santa* Clara, 208 F.3d 1085, 1089 (9th Cir. 2000).

5.      The parties agree that both current and former regulations apply to Plaintiffs'

        claims.

6.      Both regulations require that for the exemption to apply, the Plaintiffs must

        be making a certain salary and must supervise a certain number of

        employees.

7.      It is undisputed that these elements are satisfied in this case.

8.      The current regulations also require that Plaintiffs' "recommendations as to

        hiring, firing, advancement, promotion or any other change of status of other

**Findings of Fact and Conclusions of Law – Page 16**

employees are given particular weight." *See* 29 C.F.R. § 541.100(a) (2005).

9.   This element is likewise satisfied.

10.  As discussed in the Findings of Fact, Plaintiffs' recommendations on hiring, retention, promotion, advancement, and discipline were routinely approved by Store Managers because they trusted the judgment of Plaintiffs.

## <u>Management</u>

11.  The final element – at the heart of the dispute in this case – is that management must be the primary duty of Plaintiffs. *See* 29 C.F.R. § 541.100(a) (2005).

12.  The term "management" is defined in the regulations as including, but not limited to, "activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production of sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work . . . ." *See* 29 C.F.R. § 541.102 (2005).

13.  Under both the current and former regulations, this criteria is satisfied if an employee spends more than 50% of the work day managing. *See* 29 C.F.R.

**Findings of Fact and Conclusions of Law – Page 17**

§ 541.700 (2005); 29 C.F.R. § 541.103 (2004).

14.    Nevertheless, "[i]n interpreting the primary duty requirement, although the

percentage of time spent on nonexempt tasks is relevant, it is not alone

dispositive." *See Baldwin v. Trailer Inns, Inc*., 266 F.3d 1104, 1114 (9th

Cir. 2001).

15.    The regulations state that "[t]ime alone . . . is not the sole test, and nothing in

this section requires that exempt employees spend more than 50 percent of

their time performing exempt work." *See* 29 C.F.R. §  541.700(b) (2004).

16.    An employee is not disqualified from an executive exemption merely

because she concurrently performs both exempt and nonexempt work:  "For

example, an assistant manager in a retail establishment may perform work

such as serving customers, cooking food, stocking shelves and cleaning the

establishment, but performance of such nonexempt work does not preclude

the exemption if the assistant manager's primary duty is management.  An

assistant manager can supervise employees and serve customers at the same

time without losing the exemption." *See* 29 C.F.R. § 541.106.

17.    Factors other than time that are important to this determination include the

following: (1) the relative importance of managerial duties as compared with

other types of duties; (2) the frequency with which the employee exercises

discretionary power; (3) the employee's relative freedom from supervision; and (4) the relationship between the employee's salary and the wages paid other employees for the kind of non-managerial work performed by the supervisor. *Id.; Baldwin*, 266 F.3d at 1113.

## Relative Importance of Management Duties Compared to Other Duties

18.    In the Findings of Fact set forth above, the Court found that Plaintiffs' duty to select, train, motivate, and lead their team members was more important to ShopKo than any other duty.

19.    The duty to select, train, motivate, and lead employees is "management" as defined by the regulations quoted above.

20.    The Plaintiffs were in charge of their departments – they were directing and training team members even while working side-by-side with them doing hourly work. *See Baldwin,* 266 F.3d at 1114 (quoting *Donovan v. Burger King Corp.,* 672 F.2d 221, 226 (1st Cir. 1982) that "one can still be 'managing' if one is in charge, even while physically doing something else").

21.    Thus, management is Plaintiffs' primary duty. *See Baldwin,* 266 F.3d at 1114-15 (finding management was primary duty despite Plaintiffs' claim that they spent 90% of their time on nonexempt work where their "principal

**Findings of Fact and Conclusions of Law – Page 19**

value to [the employer]" was in performance of management duties); *see also, Jackson v. Advance Auto Parts, Inc.*, 362 F.Supp. 2d 1323, 1334 (N.D. Ga. 2005) (finding that where Plaintiffs "down-play and minimize the importance of [their] position[s], testifying that [they] spent most of [their] time performing routine non-managerial jobs, the courts have tended to reject such post-hoc efforts to minimize the relative importance of managerial duties").

## Exercising Discretion and Freedom from Supervision

22.   Although Plaintiffs' discretion has decreased as their supervision has increased, these two factors still favor a conclusion that management is plaintiff's primary duty.

23.   This conclusion is based on the Finding of Fact that Plaintiffs' recommendations on selection, retention, promotion, and discipline are routinely approved by Store Managers.

24.   Thus, while Plaintiffs must obtain more approvals before acting than ever before, their judgment is so trusted that they generally obtain the necessary approvals.  *See Baldwin*, 266 F.3d at 1115 (citing with approval the holding in *Burger King*, 672 F.2d at 223, finding that the primary duty of assistant managers was management even though their "tasks were governed by

**Findings of Fact and Conclusions of Law – Page 20**

highly detailed step-by-step instructions contained in the company manual
that admit of little or no variation")

**Salary**

25.    Hourly workers in departments supervised by Cheney and DePew earned
about $6.25 an hour, much less than the salary paid to Plaintiffs.

26.    The salary disparity is another factor supporting the view that Plaintiffs'
primary duty was management.

**Final Conclusion**

27.    ShopKo has carried its burden of showing that the narrow exemption to the
overtime provisions of the FLSA for persons "employed in a bona fide
executive, administrative, or professional capacity," *see* 29 U.S.C. § 213
(a)(1), applies to the Plaintiffs.

28.     Accordingly, the Court finds for ShopKo and will enter a separate Judgment

to that effect.


DATED:  **May 30, 2006**

B. LYNN WINMILL
Chief Judge
United States District Court

**Findings of Fact and Conclusions of Law – Page 22**